The DOW CHEMICAL COMPANY,
Plaintiff,

v.

Douglas M. COSTLE, Administrator of the Environmental Protection Agency, and Environmental Protection Agency, Defendants.

Civ. A. No. 79–581.

United States District Court,
D. Delaware.

Jan. 23, 1980.

Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, Del., Robert V. Zener and William DeStefano of Pepper, Hamilton & Scheetz, Philadelphia, Pa., and Washington, D. C., and James N. O'Connor, Midland, Mich., of counsel, for plaintiff.

James W. Garvin, Jr., U. S. Atty., Peggy Ableman, Asst. U. S. Atty., Wilmington, Del., James W. Moorman, Asst. Atty. Gen., Donald W. Stever, Jr. and Stephen Ramsey,

Attys., Dept. of Justice, Washington, D. C., and Ruth Greenspan Bell and John Lyon, Attys. EPA, Washington, D. C., of counsel, for defendants.

## OPINION

LATCHUM, Chief Judge.

Once again this Court finds itself spending an inordinate amount of time wading through a legal quagmire in order to determine whether it has jurisdiction to entertain the underlying controversy between the parties to this action. This time the legal confusion arises from the jurisdictional provisions of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2618. These provisions have evidently never been construed by a court of law before.

### I. *Background*

Section 6(e) of TSCA, 15 U.S.C. § 2605(e), imposes a *statutory* ban on the manufacture, processing or distribution of "polychlorinated biphenyls" ("PCBs"), subject to a limited administrative exemption which may last for only one year. Congress chose to single out PCBs for special treatment under TSCA[1] because of the extreme hazards posed by that class of substances to health and the environment. The Congressional Record abounds with references to their toxic effects. PCBs had been found to cause a wide variety of illnesses, particularly affecting the skin, the eyes and the nervous system. They were known carcinogens and suspected teratogens. These toxic effects were exacerbated by the fact that PCBs were extraordinarily persistent in the environment. They were stable compounds which were resistant to biological degradation. Moreover, the substances evidenced a strong tendency to bioaccumulate. By the time TSCA was passed, PCBs were already widely spread throughout the biosphere, and Congress decided that strong action was needed to prevent the problem from becoming worse than that which existed.[2] Consequently, amendments imposing a statutory ban on PCBs were proposed and adopted by both houses of Congress. Because of these amendments, which became Section 6(e) of the Act, the EPA was empowered, indeed required, to regulate PCBs without engaging in the procedures and making the findings that would otherwise be required to regulate under Section 6(a) of the Act.

The term "PCB" was coined to refer to certain products that were manufactured primarily by the Monsanto Company. These products consisted of mixtures of all forms of chlorinated biphenyls.

A "biphenyl" is a molecule consisting of two connected rings. Its schematic representation looks like a pair of eyeglasses:

At the point on each ring which connects to the other, there is a carbon atom:

At every other point of the rings, there is a carbon atom linked to a hydrogen atom:

1. Section 6 of TSCA, 15 U.S.C. § 2605, requires the Administrator of the EPA to regulate chemical substances which present or will present an unreasonable risk of injury to health or the environment. All substances other than PCBs must be regulated under Section 6(a) which requires that, before a substance may be regulated, the Administrator make a finding that ". . . the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities" presents or will present

such an unreasonable risk. The section then provides a wide variety of regulatory responses which the Administrator may pursue. Section 6(e) stands as an exception to 6(a) in that Congress both made the unrebuttable finding of unreasonable risk and prescribed the regulatory response.

2. Legislative History of the Toxic Substances Control Act, pp. 212–213, 223–240, 508–509, 580–590 (1976).

A "chlorinated biphenyl" (sometimes called "chloro biphenyl") is a biphenyl molecule where one or more of the hydrogen atoms has been replaced by a chlorine atom. For example:

The foregoing molecule would be called a *tetra* chlorinated biphenyl because it has four chlorine atoms. Five chlorine atoms would make it a *penta* chlorinated biphenyl; six a *hexa* chlorinated biphenyl; and so on.

The plaintiff, The Dow Chemical Company ("Dow"), manufactures and sells two products which are involved in this case. One product is a patented dielectric fluid, known as Dow Dielectric Fluid C4, which is used by the electrical industry in high voltage power capacitors. The second product is a patented heat transfer fluid, sold under the registered trademark name as Dowtherm G Heat Transfer Fluid, which is used in many industrial processes. In the process of manufacturing these two products at Dow's diphenyl oxide plant, trace amounts of "monochloro biphenyl" ("MCB") are produced as unwanted impurities. These impurities are present at concentrations of greater than 50 ppm [3] both in some of the process streams and the downstream products of the plant.

While the monochloro biphenyl is clearly a "chlorinated biphenyl," there is only one chlorine atom on one of the two above described rings of the biphenyl molecule.

Section 6(e) of TSCA, which statutorily banned "polychlorinated biphenyls," contained no definition of that term. However, on May 31, 1979, pursuant to Section 6(e), the EPA promulgated final regulations to become effective on July 2, 1979, which prohibited the manufacture, processing and distribution of PCBs and controlled their labeling and disposal. 44 *Fed.Reg.* 31514 (May 31, 1979). Those regulations defined PCBs to "mean any chemical substance that is limited to the biphenyl molecule that has been chlorinated to varying degrees or any combination of substances which contain such substance." 40 C.F.R. § 761.2(s), 44 *Fed.Reg.* 31544 (May 31, 1949).[4]

## II. *The Underlying Controversy*

Dow contends first that its two products which contain trace amounts of *mono* chloro biphenyls cannot be considered PCBs as a matter of plain English and the common meaning of the prefix "poly" in chemical nomenclature. Dow points out that "poly" usually means "two or more." Hence, monochloro biphenyl which has only one chlorine atom on one of the two rings of a biphenyl molecule is not within the purview of Section 6(e) of TSCA, which uses only the term of polychlorinated biphenyls. Dow concludes that any attempt by EPA to apply Section 6(e) to monochloro biphenyls is plainly beyond its statutory authority.

Secondly, Dow argues that the final regulations adopted by the EPA which provide that PCB means the biphenyl molecule "chlorinated to varying degrees" is at best ambiguous and considered in isolation could mean "one or more" or "two or more," but when considered in the light of the use of the word "polychlorinated biphenyls" in the statute, it cannot be considered beyond the plain language of the prefix "poly"—meaning two or more.

Finally, Dow argues that the legislative history of 6(e) shows that the PCB statutory ban was adopted because PCBs were

---

**3.** The trace amounts are, however, lower than 1000 ppm.

**4.** The ban regulations on manufacturing, processing and distributing applied to chemical substances that contain 50 ppm or greater of PCBs. 40 C.F.R. § 761.1(a); 44 *Fed.Reg.* 31543.

extraordinarily persistent, extraordinarily resistant to degradation and thus widely spread throughout the environment. Dow contends that this is not true of monochloro biphenyls because they are biodegradable and do not bioaccumulate.

Although the EPA has not addressed the merits of this case, it has pointed out that it adopted the policy of treating chlorinated biphenyls of *all* degrees of chlorination, including monochloro biphenyl, as PCBs well before the passage of TSCA. In 1973, a similar definition was proposed in rulemaking under Section 307 of the Federal Water Pollution Control Act, 33 U.S.C. § 1317. 38 *Fed.Reg.* 35388. Congress was aware of these regulations and they were cited in the debates relating to Section 6(e) of TSCA.[5] The EPA has consistently applied this policy both in later Section 307 rulemaking proposals, and under TSCA. *See, e. g.,* 41 *Fed.Reg.* 30476 (1976) (proposed toxic effluent standards); 42 *Fed.Reg.* 6533 (1977) (final toxic effluent standards); 42 *Fed.Reg.* 26565 (1977) (proposed TSCA disposal and marking rule); 43 *Fed.Reg.* 24802 (1978) (proposed TSCA PCB ban rule).

### III. *The Relief Requested*

Dow seeks an order from this Court (a) adjudging and declaring that Section 6(e) of TSCA, 15 U.S.C. § 2605(e), and the EPA regulations promulgated thereunder do not apply to monochloro biphenyl, (b) enjoining the EPA from enforcing its regulations with respect to PCBs against monochloro biphenyl, and (c) enjoining the EPA from making public statements that Dow's products containing monochloro biphenyl are subject to its regulations covering polychlorinated biphenyls.

The EPA has moved to dismiss the action on the ground, among others, that this Court lacks jurisdiction over the subject matter. First, it contends that because Dow is seeking pre-enforcement review of a regulation promulgated pursuant to Section 6(e) of TSCA, jurisdiction is improper in this Court, since Section 19(a)(1)(A) vests the courts of appeals with exclusive jurisdiction over any attempts to secure pre-enforcement review. 15 U.S.C. § 2618(a)(1)(A). It contends secondly, that even if jurisdiction is not precluded by Section 19, this Court still lacks jurisdiction because Dow has failed to exhaust available administrative remedies. Because of its disposition of EPA's first argument, this Court finds it unnecessary to reach the latter question.

### IV. *The United States Courts Of Appeals Have Exclusive Jurisdiction Over Actions Seeking Pre-enforcement Judicial Review Of Rules Promulgated Under Section 6(e) of TSCA*

This Court finds that it lacks jurisdiction to hear this case. TSCA clearly provides that the United States Courts of Appeals are vested with exclusive jurisdiction over *any* attempt to secure pre-enforcement judicial review of a rule promulgated under Section 6(e) of TSCA. Section 19(a)(1)(A) provides:

Not later than 60 days after the date of promulgation of a rule under section . . . 2605(e) . . . of this title, any person may file a petition for judicial review of such rule with the United States Court of Appeals for the District of Columbia Circuit or for the circuit in which such person resides or in which such person's principal place of business is located. *Courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of such a rule if any district court of the United States would have had jurisdiction of such action but for this subparagraph.* (emphasis added). 15 U.S.C. § 2618(a)(1)(A).

In regards to this issue, the statutory language is utterly without ambiguity. In *"any action"* other than an enforcement proceeding, *"exclusive jurisdiction"* lies with the Courts of Appeals. When the statutory language is clear, as it is here, that language is "the most determinative guide of any piece of legislation." *Dow*

---

5. *See,* Legislative History of the Toxic Substances Control Act, pp. 581, 584 (1976).

*Chemical Co. v. E. P. A.*, 605 F.2d 673, 688 (C.A.3, 1979). Consequently, this Court holds that if jurisdiction over this action is proper anywhere, it is proper only in the courts of appeals.

Dow contends that even though Section 19(a)(1)(A), when read alone would be unambiguous, the language of Section 19(e) creates an ambiguity in the statute. Section 19(e) provides:

> (e) Other remedies.—The remedies as provided in this section shall be in addition to and not in lieu of any other remedies provided by law.

15 U.S.C. § 2618(e). Dow contends that in light of this language, Section 19(a)(1)(A) should be interpreted solely to provide an additional right for *any* citizen to challenge certain regulations in the courts of appeals within 60 days of the promulgation of those regulations while leaving intact the rights of those who would have had the right to seek pre-enforcement review pursuant to jurisdictional grants other than those contained in TSCA. TSCA's grant of exclusive jurisdiction in the courts of appeals was meant to apply only to this *new* right of action. Dow further contends that this interpretation is mandated by the clear directive of the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) "that only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."

Although the language of Section 19(e) may raise some ambiguity,[6] that ambiguity is dispelled by the explanation given of that provision in the Conference Report. That Report directed that Section 19(e)

> should not be construed, however, to negate the provision in this section which specifically provides that the United States courts of appeals shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) if any district court of

the United States would have had jurisdiction of such an action but for the provisions of this section.

Legislative History of the Toxic Substances Control Act, p. 709 (1976). This statement in the legislative history and the clear language of the statute itself constitute "clear and convincing evidence" of the congressional intent to restrict jurisdiction over pre-enforcement judicial review of regulations issued pursuant to Section 6(e) of TSCA.

This holding does not render the language of Section 19(e) meaningless. It can be interpreted to provide that if any statute other than TSCA creates a right to seek pre-enforcement review, that right is preserved, but jurisdiction over those actions may be had only in the courts of appeals. Section 19(a)(1)(A) consists of two sentences. The first provides any citizen the right to challenge rules promulgated under Section 6(e) within 60 days of promulgation in the courts of appeals. The second sentence provides that the courts of appeals shall have exclusive jurisdiction over *any* action seeking pre-enforcement judicial review if the district court would otherwise have had jurisdiction. This second sentence could only refer to actions such as the one Dow seeks to litigate here. Since the first sentence, which creates the new right to seek review, provides that the courts of appeals would have exclusive jurisdiction over such actions, the second sentence would be superfluous if it were not meant to refer to actions such as the one involved here. The phrase, "if any district court of the United States would have had jurisdiction of such action but for this subparagraph," which appears in the second sentence, is a further clear indication that that sentence was meant to shift jurisdiction in cases such as the present one from district courts to courts of appeals. When read in this manner, the statute would not preclude pre-enforcement judicial review, but would

---

6. This Court does not believe that it does raise any ambiguity when the statute is interpreted as it is *infra*.

simply change the forum in which such review could be sought.[7]

Dow next contends that even assuming that the interpretation of the statute adopted here would be proper in a case addressing the question *de novo*, prior decisions in the general area preclude the adoption of such an interpretation. Dow argues that the "clear teaching" of *Utah Power & Light Company v. EPA*, 180 U.S.App.D.C. 70, 553 F.2d 215 (C.A.D.C.1977), *West Penn Power Company v. Train*, 522 F.2d 302 (C.A.3, 1975), *cert. denied* 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976), and *Amoco v. U. S.*, 450 F.Supp. 185 (W.D.Mo.1978) would require the jurisdictional provisions of

TSCA be interpreted to limit the congressional grant of exclusive jurisdiction to the courts of appeals to cases challenging the validity of regulations, while leaving jurisdiction to hear cases involving questions of application or interpretation of regulations with the district courts. Even assuming that Dow is here raising a question of application or interpretation, and assuming that, under the cases cited, jurisdiction in the district courts would be proper,[8] those cases are simply irrelevant to the present case. All three involved the jurisdictional provision of the Clean Air Act, 42 U.S.C. § 7607(b). That provision, which is quoted in the margin,[9] is clearly different from

**7.** In so holding, the Court does not mean to express any opinion on the question of whether the 60-day limitation appearing in the first sentence would bar only the right of action provided by that sentence or whether it would also bar rights of action created by other statutes. Indeed, Congress may have intended to create a limitation of both the action it was creating and any rights of action provided by other statutes.

**8.** Contrary to Dow's contentions, the cases cited do not stand for the proposition that the district courts have jurisdiction to hear all actions seeking pre-enforcement review of interpretations or applications of rules promulgated under the Clean Air Act. The court in *Utah Power & Light* held only that jurisdiction was not proper in the courts of appeals and noted, "*if federal review* of the action challenged here *is available at all*, it should be sought in the district court." Thus, that court left open the question of whether any court would have jurisdiction over actions seeking pre-enforcement review. The *Amoco* case read *Utah Power & Light* to hold that jurisdiction was proper in the district court and relied upon that reading in reaching its result. Because this Court does not find that the *Utah Power & Light* court so held, it finds the *Amoco* case unpersuasive. Finally, while the Third Circuit, in *West Penn Power Company*, did hold that the jurisdictional provision of the Clean Air Act, 42 U.S.C. § 7607(b) did not preclude pre-enforcement review of interpretations or applications of rules, it also held that the party seeking pre-enforcement review must establish that the district court has jurisdiction to hear the action under some other statute. In *West Penn*, the court found that the statutes under which jurisdiction was claimed did not provide the district court's jurisdiction. The statutes in that case were apparently identical to the ones under which Dow claims jurisdiction in the present case. Because of this Court's interpretation of

the relevant TSCA provisions, it has not considered and will not reach the question of whether but for the provisions of Section 19(a)(1)(A) this Court would have jurisdiction to consider the issues presented by this case.

**9.**                     Judicial review

(b)(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title, any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title) any determination under section 7521(b)(5) of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412(c) of this title, under section 7413(d) of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 119(c)(2)(A), (B), or (C) (as in effect before August 7, 1977) or under regulations thereunder, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for

Section 19(a)(1)(A) of TSCA. If the provision in TSCA contained only the first sentence, then the Clean Air Act provision might be analogous.[10] The Clean Air provision does provide the right to file petitions seeking review of certain actions within sixty days of those actions, and that provision limits jurisdiction over *such actions* to the courts of appeals. However, there is no second sentence which provides that the courts of appeals have "exclusive jurisdiction" over "any action" seeking judicial review. Similarly, there is no possible redundancy, as there would be in TSCA if the view urged by Dow were accepted. Finally, the Clean Air Act provision contains no mention of actions over which district courts would have jurisdiction *"but for"* its provisions. Thus, cases interpreting the Clean Air Act are irrelevant.

## V. *Dow Is Challenging The Validity Of Regulations Promulgated Pursuant To Section 6(e) Of TSCA*

Even if the strained reading of the statute proposed by Dow were adopted, and Section 19(a)(1)(A) were read to permit pre-enforcement judicial review of interpretations or applications of the relevant rules by district courts, this Court would still be compelled to find that it lacked jurisdiction. Although Dow claims that it is challenging an interpretation and application of 40 C.F.R. § 761.2(s), the TSCA regulation defining PCBs, it is obvious that it is, in fact, challenging the validity of the regulation, itself.

The question of whether a given argument constitutes an attack on the validity of a regulation or upon an interpretation or application is often a difficult one and is certainly one that cannot be answered by the application of a set or simple formula. The difference between an attack on a regulation and an attack on an interpretation of a regulation is often one of degree. For example, an argument that contended that the plain and universally recognized meaning of a regulation should be abandoned or significantly narrowed because that interpretation would constitute an exercise of power not warranted by the empowering statute would obviously be an attack on the validity of the regulation. However, it could still be styled as an attack on an interpretation. The same could be said of a similar challenge to an application that was obvious and intended by the EPA at the time the regulation was promulgated.

Two principal questions ought to be addressed in determining whether a given attack is upon the validity of a regulation or it is upon an interpretation or application of that regulation. The first question is whether the challenged interpretation or application was obvious at the time the regulation was published. If it were obvious, the challenge would be more likely to be an attack on the validity of the regulation. The opinions in both *West Penn Power Co. v. Train, supra,* and *Utah Power & Light v. EPA, supra,* seemed to focus on this question by noting that those challenges to a rule that could have been raised upon promulgation were the types of challenges falling within the exclusive jurisdiction of the courts of appeals under the

---

review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.

10. Even if Section 19(a)(1)(A) of TSCA were limited to the first sentence, the Clean Air Act provision would still differ significantly. Insofar as the language of that provision differs significantly from that of the first sentence of the TSCA provision, the Clean Air Act provision may provide a much narrower scope of review. *See, Utah Power & Light v. EPA, supra,* at 218, n.14.

Clean Air Act. A number of factors might be relevant to the question of obviousness. Such factors would include the ambiguity of the language of the regulation on its face, the regulatory history, the comments received, the understandings of those involved in and commenting upon the regulation at the time of promulgation, relevant judicial decisions, and the use of the language in past regulations. The second major question which must be addressed is the question of the nature of the attack. An argument that a given interpretation or application is not authorized by the statute or is unconstitutional is more likely to be an attack upon its validity. An argument which relies solely on the words of the regulation, the regulatory history, and agency practice is more likely to involve genuine questions of interpretation or application. The court in *Utah Power & Light* alluded to the importance of this question when it noted that "courts have distinguished between claims that an agency's action is *ultra vires* and claims that an agency's interpretation of the act it administers is legally unsound." 553 F.2d at 218, n.13.

An examination of the history of the regulation at issue here and the nature of Dow's challenge, in light of the guidelines discussed above, leads the Court to conclude that Dow is challenging the validity of the regulation itself and not an unexpected interpretation and application of it.

First, the nature of Dow's argument on the merits reveals that it is really attacking the validity of the regulation by contending that EPA lacks the statutory authority to regulate MCBs. It is important to note at the outset that if the challenge which Dow is mounting here is a challenge to the application of a *regulation* defining "polychlorinated biphenyl" to MCBs, it should involve the interpretation of the terms of the regulation, *not the statutory term* "polychlorinated biphenyl". The regulation, which defines PCB to be

> any chemical substance that is limited to the biphenyl molecule that has been chlorinated to varying degrees or any combi-

nation of substances which contains such substance.

40 C.F.R. § 761.2(s) (1979), does not use the term "polychlorinated biphenyl." Dow's examination of the meaning of the words of the regulation and the regulatory history is limited, in its brief on the merits, to the purely conclusory allegation that "The regulation does not specify whether 'varying degrees' means 'one or more' or 'two or more.'" (Docket Item 3, pp. 4–5). Dow then goes on to argue that because of this alleged "ambiguity," it is necessary to examine the meaning of the statutory term, "polychlorinated biphenyl." The vast bulk of its argument is then devoted to a linguistic analysis of the statutory term and references to the legislative history in order to determine *legislative* intent. It is evident that Dow's argument is not really concerned with the meaning of the regulation but is using the regulation to allow it to leapfrog into an attack on EPA's statutory authority to regulate monochloro biphenyl under Section 6(e). This is further evidenced by the conclusion reached by Dow in its brief: "Thus any attempt by EPA to apply Section 6(e) to a monochloro biphenyl would be plainly beyond its statutory authority. Moreover, since the language of the regulation itself does not reach beyond the plain meaning of the prefix 'poly,' the regulation cannot be read to arrogate to EPA authority it does not have." (Docket Item 3, p. 11). Dow is clearly arguing first that the EPA does not have the authority to regulate monochloro biphenyls under Section 6(e) and that, because of this, the regulation cannot be read to apply to such substances.

The Court also concludes that, at the time the regulation was published, it was apparent that it included MCBs.

First, the express language of the definition in the regulations, when read in isolation, would seem to apply to all chlorinated biphenyls. It refers to biphenyl molecules "chlorinated to varying degrees" without limitation. It does not provide "to varying degrees greater than one." Webster's New Collegiate Dictionary (1976) defines "vary"

as "to take on successive values" or "to exhibit or undergo change." Biphenyl molecules chlorinated by successive degrees would include biphenyl molecules chlorinated to one degree.

The history of this definition dispels any doubts that it was understood to apply to MCBs at the time 40 C.F.R. § 761.2(s) was promulgated. As noted before, the EPA has consistently used this definition in all of its regulations concerning PCBs. Discussions in earlier rulemaking proceedings have indicated that the definition of PCBs would include MCBs. On February 2, 1977 the EPA adopted rules setting effluent standards for PCBs under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* That rulemaking proceeding, the record of which was included in the rulemaking proceedings under Section 6(e) of TSCA, 43 *Fed.Reg.* 38057 (Aug. 25, 1978), defined PCBs to be "a mixture of compounds composed of the biphenyl molecule which has been chlorinated to varying degrees" and discussed the nature of PCBs as follows:

> PCBs are mixtures of chlorinated biphenyls with varying degrees of chlorination and isometric substitution. PCBs are manufactured by the reaction of biphenyl with chlorine in the presence of a catalyst. (A biphenyl is a hydrocarbon consisting of two six-membered carbon rings—or phenyl rings—joined together.) *During the formation of PCBs, chlorine atoms are substituted for hydrogen atoms successively at one or more of the 10 available positions on the biphenyl molecule.* Chlorinated biphenyls (CBs) are substances composed of biphenyl molecules with 1 to 10 chlorine substitutions. CBs with the same number of chlorine atoms in the molecule are known as homologs (or congeners) and are named according to number of chlorine atoms (e. g., the homologs with 4 chlorine atoms per molecule are called tetra-chlorobiphenyls or tetra-CBs). Each homolog may exist in a number of different forms, known as isomers, in which the chlorine atoms are attached to the molecules at different points. Each isomer is named

according to the positions of substitution, following a standardized number scheme. PCBs are mixtures, each of which contains several homologs, each of which is represented by a number of isomers. (emphasis added).

*Id.* at 6533. It is evident from that discussion both that the EPA was treating PCBs and CBs as identical in its regulations and that the regulations extended to monochloro biphenyls. The definition of PCBs found in 40 C.F.R. § 761.2(s) was also used in EPA's proposed regulations governing the disposal and marking of PCB products under TSCA, 42 *Fed.Reg.* 26564 (May 24, 1977). The discussion in those proposed regulations unambiguously indicated that the definition of PCBs proposed there, and at issue here, included MCBs. It stated, "there are 209 different ways in which one to ten chlorine atoms may replace hydrogen ions on the biphenyl molecule."

Prior comments of both Dow itself and the comments of other companies indicate their clear understanding of the intended scope of the definition adopted by the EPA. In the rulemaking proceedings under Section 307 of the Federal Water Pollution Control Act, Dow submitted a comment objecting specifically to the use of the definition of PCBs used both there and in the TSCA regulations. Dow commented, "This definition includes all biphenyls which have any degree of chlorination ranging from one to ten." (Docket Item 15). Three companies submitted comments during the rulemaking procedures adopting 40 C.F.R. § 761.2(s) which reveal their understanding that that definition encompassed MCBs. Dow Corning, a joint venture in which Dow is a 50% owner and which is headquartered in the same city as Dow, specifically stated that "the definition of PCBs should specifically exclude monochlorinated biphenyls." (Affidavit of Joni Repasch, Docket Item 15, Appendix 1). The comments of both Stauffer Chemical Company and Sun Chemical Corporation submitted in that rulemaking indicate their clear understanding that MCBs fell within the regulatory definition of PCBs. (Docket Item 18, Attachments A

and B). Thus, the comments of regulated industries, including Dow itself, in rulemaking proceedings indicate their understanding of the scope of the definition of PCBs found at 40 C.F.R. § 761.2(s).

The history of the development of the regulation provides further evidence of the awareness of the public, in general, and Dow, in particular, of the scope of its definition of PCBs. At an early point in the rulemaking, the EPA proposed as a definition for PCB isomers, the following: ". . . a compound resulting from the replacement of two or more of the hydrogen atoms on the biphenyl molecule with chlorine atoms." (Docket Item 13A, Appendix D). Although the majority of participants in the proceedings commenting upon this proposed definition found it acceptable, one representative of a citizen's group vigorously urged that it be changed to include MCBs. (Docket Item 13A, Appendix E, p. 110). Dow was listed as a participant to those proceedings. The EPA subsequently abandoned the proposed definition and returned to the definition it had used in the past. This change is significant and should have alerted Dow to EPA's intention to include MCBs in its definition of PCBs.

Past judicial opinions should also have alerted Dow to the fact that the definition of PCBs found at 40 C.F.R. § 761.2(s) would extend to cover MCBs. At least one judicial opinion had been published prior to the promulgation of the regulations at issue here which had dealt with the question of regulation of the less chlorinated PCBs under Section 307 of the Clean Water Act. As mentioned before, the definition of PCBs in those regulations was substantially identical to that found in 40 C.F.R. § 761.2(s). Since the Clean Water Act contains no statutory definition of PCBs, any decision rendering an interpretation of the meaning of the term PCB under that Act, would of necessity be interpreting the definition adopted in the regulation, and, consequently, the meaning of 40 C.F.R. § 761.2(s). In *Envi-*

*ronmental Defense Fund v. E. P. A.,* 194 U.S.App.D.C. 143, 598 F.2d 62 (C.A.D.C. 1978), industry petitioners claimed that the EPA's regulations lacked an adequate basis in the record to the extent that they covered less chlorinated PCBs because of the allegedly lower risks presented by those compounds. The court's discussion in rejecting that claim indicates its understanding that MCBs were among the less chlorinated biphenyls subject to those regulations, and, hence, included within the regulatory definition. In describing PCBs the court noted, "PCBs vary with respect to how much chlorine is substituted for hydrogen, ranging from one to ten chlorine atoms per molecule of PCBs." 194 U.S.App.D.C. at 159, 598 F.2d at 78. In a footnote, the court made its understanding even clearer:

> If only a single chlorine atom has been substituted *the PCB is monochlorobiphenyl.* If two have been substituted, *the PCB is bichlorobiphenyl,* and so on, up through and beyond, tri, tetra, penta, and hexachlorobiphenyl with its six chlorine atoms. *The general term "polychlorinated biphenyl" is used to cover them all.* *Id.* 194 U.S.App.D.C. 159, n.61, 598 F.2d at 78, n.61. (emphasis added).

█ Thus, this Court finds that at the time the EPA issued 40 C.F.R. § 761.2(s), the words of that regulation had been used before and their meaning was known. Those words had been used in regulations issued under the Clean Water Act, and those words were evidently understood by the EPA, by the courts, and by industry representatives, including Dow, to include MCBs. Because of this finding, and because of the nature of the challenge mounted by Dow in this case, the Court finds that Dow is questioning the validity of the regulation and not an unexpected interpretation or application. If Dow had wished to challenge EPA's authority to regulate MCBs under Section 6(e), it would have had to challenge the regulation in the courts of appeals within 60 days of promulgation.[11]

11. Dow does not deny that it could have done so. Even if Dow were unaware that the PCB regulations would apply to its products at the

time the regulations were promulgated, it does not deny that the EPA had informed Dow that the regulations did include MCBs before the

Consequently, this Court concludes, that even if Dow's interpretation of the Section 19(a)(1)(A) of TSCA is correct, it still lacks jurisdiction over the subject matter.

Consequently, the EPA's motion to dismiss will be granted.

An Order will be entered in accordance with this Opinion.

60-day limitation period had run. The Court's decision here does not leave Dow without remedies. Dow had petitioned for an exemption to the PCB regulations pursuant to the statutory exemption procedure. 15 U.S.C. § 2605(e)(3)(B). It can also petition the EPA for an amendment or repeal of the regulation pursuant to 15 U.S.C. § 2620. The EPA must respond to such a petition and its response is judicially reviewable. 15 U.S.C. § 2620(b)(1). Finally, if an enforcement proceeding should be brought, Dow could press the very points it is seeking to have adjudicated, here. Thus, there is no danger that Dow will be deprived of property without a determination of these issues before a judicial forum.