NATURAL RESOURCES DEFENSE COUNCIL, INC., and Industrial Union Department, American Federation of Labor-Council of Industrial Organizations, Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, William D. Ruckelshaus, as Administrator, U.S. Environmental Protection Agency, and John A. Moore, as Assistant Administrator for Pesticides and Toxic Substances, U.S. Environmental Protection Agency, Defendants.

The Chemical Manufacturers Association, Intervenor-Defendant,

and

The American Petroleum Institute, Intervenor-Defendant.

No. 83 Civ. 8844 (KTD).

United States District Court, S.D. New York.

Aug. 28, 1984.

As Amended Sept. 26, 1984.

Natural Resources Defense Council, Inc., New York City, for plaintiffs; Eric A. Goldstein, Jacqueline M. Warren, James Thornton, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., for defendants, New York City, R. Nicholas Gimbel, Asst. U.S. Atty., New York City, of counsel; Andrew G. Gordon, U.S. Environmental Protection Agency, and Michael W. Steinberg, Environmental Defense Section—Land and Natural Resources Division, U.S. Dept. of Justice, Washington, D.C., for defendants.

Richards O'Neil & Allegaert, New York City, Covington & Burling, and Chemical Manufacturers Association, Washington, D.C., for Chemical Manufacturers Association; Robert M. Sussman, John Seymour, New York City, and David F. Zoll, Sanford E. Gaines, Washington, D.C., of counsel.

Shereff, Friedman, Hoffman & Goodman, New York City, Akin, Gump, Strauss, Hauer & Feld, American Petroleum Institute, Washington, D.C., for American Petroleum Institute; Jerome Marshak, New York City, and Daniel Joseph, Ronald M. Johnson, and Stark Ritchie, General Counsel, Martha A. Beauchamp, John C. Chambers, Washington, D.C., of counsel.

## OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge:

Defendants, the United States Environmental Protection Agency and certain Agency officials (collectively "EPA") move to dismiss or in the alternative for summary judgment dismissing plaintiffs' complaint in this action. Plaintiffs Natural Resources Defense Council, Inc. and the Industrial Union Department of the American Federation of Labor-Council of Industrial Organizations (collectively "NRDC") cross-move for partial summary judgment on the issue of liability. Additionally, the intervenor-defendants, the American Petroleum Institute ("API") and the Chemical Manufacturers Association ("CMA"), have provided memoranda in support of EPA's motion to dismiss or for summary judgment. For the reasons that follow, EPA's motions are denied in part and granted in part, and plaintiffs' motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs brought this action seeking an order requiring the EPA's compliance with provisions of the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq. ("TSCA" or "the Act"). TSCA was enacted in response to what Congress perceived as the unreasonable risks associated with the increasing marketing of chemical products whose potential toxicity was as yet untested. See

U.S.Code Cong. & Ad.News 4491, 4493, 94th Cong., 2d Sess. (1976).

Presently, the Nations' population and environment provide testing grounds for determining the effects a toxic substance has on human or environmental health. The authority contemplated by the Toxic Substances Control Act would establish requirements for testing substances believed to pose an unreasonable risk before they are dispersed by various means throughout the environment and are difficult, if not impossible, to control.

H.Rep. No. 94–41, Toxic Substances Control Act, Hearings Before the Subcommittee on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, 94th Cong., 1st Sess. 213 (1975). TSCA, 15 U.S.C. § 2603 provides for EPA issuance of rules requiring testing of chemicals which may present unreasonable risks of injury to human health or the environment. The testing required by such rules is to be carried out and financed by the manufacturers and/or processors of the chemical substances. *See* TSCA, 15 U.S.C. § 2603(b)(3). In section 2603(e) of the Act, Congress established an expert panel of government scientists, known as the "Interagency Testing Committee" ("ITC"). ITC is directed to select and recommend to EPA a list of those chemicals whose potential risks to health and the environment are determined to warrant "priority consideration by the agency for the promulgation of a rule ...." 15 U.S.C. § 2603(e)(1)(A). Thereafter the EPA is required within twelve months of the date on which the substances are first designated to "either initiate a rulemaking proceeding under subsection (a) ... or if such a proceeding is not initiated within such period, publish in the Federal Register the [EPA] Administrator's reason for not initiating such a proceeding." 15 U.S.C. § 2603(e)(1)(B).

A test rule "shall" be promulgated if EPA finds that:

(A)(i) the manufacture, distribution in commerce, processing, use, or disposal of a chemical substance or mixture ... may present an unreasonable risk of injury to health or the environment,

(ii) there are insufficient data and experience upon which the effects of such manufacture ... on health or the environment can reasonably be determined or predicted, and

(iii) testing of such substance or mixture with respect to such effects is necessary to develop such data; or

(B)(i) a chemical substance or mixture is or will be produced in substantial quantities, and (I) it enters or may reasonably be anticipated to enter the environment in substantial quantities or (II) there is or may be significant or substantial human exposure to such substance or mixture,

(ii) there are insufficient data and experience upon which the effects of the manufacture ... on health or the environment can reasonably be determined or predicted, and

(iii) testing of such substance or mixture with respect to such effects is necessary to develop such data.

15 U.S.C. § 2603(a)(1).

The final test rule must identify, *inter alia*, the chemical(s) to be tested, the specific effects for which testing must be done,[1] the test standards or protocols, and the deadlines for test completion and submission of data. *See id.* § 2603(b)(1). To formulate a final rule, EPA is required first to publish proposed rules with these characteristics, soliciting public commentary. *See* Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (notice and comment provision); *see also* 15 U.S.C. § 2603(b)(5).

The central issue in this case is whether EPA's implementation of TSCA with respect to sixteen ITC-designated chemicals

---

**1.** The health and environmental effects for which standards for the development of test data may be prescribed include carcinogenesis, mutagenesis, teratogenesis, behavioral disorders, cumulative or synergistic effects, and any other effect which may present an unreasonable risk of injury to health or the environment.

15 U.S.C. § 2603(b)(2)(A).

satisfies this statutory mandate to either initiate rulemaking or to publish EPA's reasons for not initiating such proceedings. Plaintiffs' sixteen-claim complaint divides into four categories: (1) that EPA violated the TSCA by accepting negotiated voluntary testing programs instead of proposing formal test rules (Claims One to Four); (2) that EPA unlawfully delayed test rulemaking by issuing an Advance Notice of Proposed Rulemaking ("ANPR") for one chemical category instead of proposing a test rule (Claim Five); (3) that EPA violated TSCA by proposing test rules in two phases with the first phase omitting proposed testing standards and deadlines (Claims Six to Eleven), and (4) that EPA violated TSCA by unreasonably delaying final promulgation of test rules for certain ITC-designated chemical substances (Claims Twelve to Sixteen). I will address the parties' motions in the context of each of the four separate categories.

## DISCUSSION

### I. Negotiated Voluntary Testing Agreements

#### A. Description

In late 1981 and early 1982, EPA announced in the *Federal Register* that it would consider accepting voluntary testing programs in certain circumstances. These programs would be negotiated and conducted by manufacturers or processors of ITC designated chemical substances in lieu of initiating a rulemaking proceeding. *See* 47 Fed.Reg. 335 (Jan. 5, 1982); 46 Fed.Reg. 53775 (Oct. 30, 1981). EPA asserts that it adopted this new policy based upon the belief that such agreements would provide the required health and environmental effect test data in an expeditious manner. *See* Affidavit of Don R. Clay (EPA Office Director for the Office of Toxic Substances) ¶ 27 at 12.

According to EPA, after ITC designates priority lists of chemical substances in the *Federal Register*, EPA conducts two public meetings scheduled at ten and sixteen weeks after the ITC designation. *Id.* ¶¶ 16, 18 at 8, 9. At the second meeting, EPA announces its preliminary decision whether to require testing. If EPA determines that no testing is necessary, it publishes a *Federal Register* notice describing its reasoning. If it determines that testing is necessary, EPA begins work on a test rule and "simultaneously [invites] industry initiation of negotiations for the purpose of developing a negotiated testing program." *Id.* ¶ 19 at 9.

By week twenty-four, EPA requires that its scientists and the industry representatives have reached preliminary agreement on a testing program. *Id.* ¶ 21 at 10. Between weeks sixteen and twenty-four EPA apparently holds informal meetings with industry to attempt to reach this negotiated test agreement. *Id.* ¶ 20 at 10. EPA reviews the manufacturers' study plans which include test standards and schedules for submission of test data. Acceptable proposals are published and the ensuing comments are reviewed before publication of EPA's final decision to adopt a negotiated voluntary testing agreement. *Id.* ¶¶ 22–26 at 10–12.

Plaintiff's first four claims are based on ITC's designation, between November 1980 and May 1982, of four chemicals warranting priority rulemaking consideration and review by EPA.[2] In the two to four years since their designations, EPA has not initiated rulemaking proceedings; rather, within twelve months of each of the designations EPA accepted or tentatively accepted voluntary testing programs negotiated with industry.[3]

#### B. Jurisdictional Defenses

Plaintiffs brought this action pursuant to 15 U.S.C. § 2619(a)(2) which provides that

---

**2.** The chemicals in Claims One through Four and their ITC designation dates, and recommended testing, are attached as Appendix 1.

**3.** *See* 46 Fed.Reg. 53775 (Oct. 30, 1981) (Benzyl butyl phthalate); 47 Fed.Reg. 18172 (April 28, 1982) (2-Cholorotoluene); 47 Fed.Reg. 50555 (Nov. 8, 1982) (4-Chlorobenzotrifuloride); 48 Fed.Reg. 23098 (May 28, 1983) (Formamide).

"any person may commence a civil action ... against the [EPA] Administrator to compel the Administrator to perform any duty under this Act which is not discretionary." EPA contends that it has no mandatory duty to issue test rules and therefore its discretionary acts are not subject to review by a citizen-suit civil action.

■ "While it is intended that a recommendation of the [ITC] be given great weight by the Administrator, it should be emphasized that the decision to require testing rests with the Administrator." H.R.Conf.Rep. No. 94–1679, 94th Cong., 2d Sess. 62 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 4539, 4547. It is the province of EPA to evaluate the criteria of section 2603(a)(1)(A) or (a)(1)(B) to determine whether testing is appropriate. Section 2603(e)(1)(B) provides the agency with a choice of either initiating a rulemaking proceeding or publishing its reasons for not doing so. It is evident, however, that the Administrator's duty to choose either to initiate rulemaking proceedings or to publish its reasons for not doing so is a mandatory choice that it must make.[4] Thus, plaintiffs may invoke section 2619(a)(2) to review whether EPA carried out this nondiscretionary act.[5]

### C. Negotiated Testing Programs and TSCA

At the outset, EPA notes that with respect to each of the four chemicals in Claims One through Four of plaintiffs' complaint there have been no formal findings that the threshold requirements for initiating rulemaking proceedings have been met. For example, there has been no express finding that there is insufficient data on these chemicals presenting an unreasonable risk of injury to public health or to the environment. *See* section 2603(a). EPA asserts that it is under no obligation to make such determinations. In addition, EPA contends that even if the standards were applied to plaintiffs' first four claims, the facts demonstrate that "testing ... is [not] necessary to develop [data revealing] the effects ... of such substance ... on health or the environment ...." 15 U.S.C. § 2603(a)(1)(A)(ii), (iii). Because EPA has arranged to obtain testing data by the negotiated voluntary agreements, defendant maintains that testing is no longer necessary to develop such data.

■ Although it does not appear that publication of findings concerning the threshold determinations is obligatory, I find for the reasons that follow that EPA's program of negotiating voluntary testing agreements subverts the statutory scheme.

Both in the legislative history of TSCA and on the face of the statute, Congress has evinced its intention that chemicals on which there is insufficient data will be tested pursuant to formal rulemaking. *See* Legislative History of the Toxic Substances Control Act, House Committee of Interstate in Foreign Commerce, 94th Cong., 1st Sess. 158, 162–63, 166, 171–73, 254, 410, 424, 668, 674, 722–23, 747 (1976) ("TSCA Legislative History"). For example, in the Legislative History the House Report summarizes:

Briefly, the bill will

---

4. Use of the word "shall" in the statute is indicative of mandatory obligations. *See Association of American Railroads v. Costle*, 562 F.2d 1310, 1312 (D.C.Cir.1977).

5. Defendants also maintain that plaintiffs' only, or at least preliminary, recourse is the petition provisions of section 2620(a) which states that "[a]ny person may petition the Administrator to initiate a proceeding for the issuance, amendment, or repeal of a rule under section 2603 ...." I agree, however, with Judge Pierce's conclusion in *NRDC v. Costle:*

Subsection (b)(5) of this statute provides that "the remedies under this section shall be in addition to, and not in lieu of, other remedies provided by law." The Act apparently contains two provisions for citizen review of EPA compliance. In the Court's view, plaintiff is not required to rely exclusively upon utilization of a citizen's petition.

10 Envtl.L.Rep. (Envtl.L.Inst.) 20274, 20277 (S.D.N.Y. Feb. 4, 1980). The petition provision is broader permitting some review of both discretionary and nondiscretionary agency acts; the citizen-suit provision only applies to mandatory agency acts.

—Require manufacturers and processors of potentially harmful substances and mixtures to test the substances and mixtures, *as required by rules* issued by the Administrator of the Environmental Protection Agency, so that their effect on health and the environment may be evaluated.

Legislative History at 410 (emphasis added).

EPA's assertion that it has not made the requisite threshold findings necessitating the initiation of rulemaking proceedings is specious. Section 2603 was promulgated to mandate the testing of potentially dangerous chemicals on which there was insufficient data existing at the present time. EPA's negotiation and acceptance of voluntary testing agreements by the manufacturers obviously reflects EPA's belief that additional data concerning the chemicals in question needs to be developed. The absence of a formal finding of testing necessity cannot hide EPA's evident *de facto* findings of such a necessity.[6] It is the substance not the form of agency action that is relevant upon review. *See Columbia Broadcasting System v. United States*, 316 U.S. 407, 416, 62 S.Ct. 1194, 1199, 86 L.Ed. 1563 (1942).

Furthermore, I can find no support for EPA's decision to utilize negotiated testing agreements instead of the statutorily-prescribed initiation of rulemaking proceedings either on the face of the statute or based on some vague assertion of agency discretion. "The agency charged with implementing the statute is not free to evade the unambiguous directions of the law merely for administrative convenience." *Brown v. Harris*, 491 F.Supp. 845, 849 (N.D.Cal.1980) (citing *Manhattan General Equipment Co. v. The Commissioner of Internal Revenue*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936)). "It is

not an agency's prerogative to alter a statutory scheme even if its assertion is as good or better than the congressional one." *Mid-Louisiana Gas Co. v. Federal Energy Regulatory Commission*, 664 F.2d 530, 535 (5th Cir.1981), *vacated and remanded on other grounds sub nom, Public Service Commission of the State of New York v. Mid-Louisiana Gas Company*, 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983). In fact, in the more than seven years since TSCA's enactment, though seventy-three chemicals have been designated by ITC for priority rulemaking consideration, EPA has yet to finalize a single test rule. Congress could not have intended (or envisioned) this result.

In addition to violating the test rule promulgation process, EPA's failure to utilize the rulemaking process circumvents several other statutory provisions. *See, e.g.,* 15 U.S.C. § 2603(d) (prompt notice for public review of test rule-generated data); *id.* § 2604(a) & (b) (submission to EPA of test data prior to new manufacture of chemicals subject to test rule); *id.* § 2607(a)(3)(A) (record-keeping and reporting requirements of small quantity manufacturers of test rule chemicals); *id.* § 2611(b) (notice to importing foreign government of test rule data availability); *id.* § 2615(a)(1) (sanctions for noncompliance with testing program); *id.* § 2617(a)(2)(A) (test rule's preemption of state and local programs); *id.* § 2618(a)(1)(A) (authorized judicial review of testing rules), and *id.* § 2619(a)(1) (authorized citizen suits to compel compliance with test rules process).

The intervenor Chemical Manufacturers Association's ("CMA") argument that "most" of these provisions are "essentially" satisfied by other mechanisms misses the point. Congress detailed a complex and comprehensive statute for the testing of potentially toxic chemical substances. It

---

6. For example, EPA states "[a]ssuming data is not already available,. the only reason testing would *not* be 'necessary' to obtain it [sic] is if there is reason to believe that the information *will be* developed through means other than tests required by rule." EPA's Reply Memorandum at 9 n. * (emphasis supplied in part).

However, TSCA section 2603(a)(1) requires EPA to evaluate the *present* availability of information and need for testing. *See also* 15 U.S.C. § 2603(e)(1)(A)(vii). Defendants' contrary interpretation would obviate the necessity of ever initiating formal rulemaking.

further specified several important additional safeguards triggered by rulemaking results. It is not now the prerogative of EPA to substitute for this intricate framework a number of haphazard and informal purported equivalents.

Furthermore, despite CMA's assertion, several of these statutory provisions have no equivalents whatsoever. *See, e.g.,* 15 U.S.C. § 2607(a)(3)(A) (record-keeping and reporting requirements for small manufacturers). And many of the putative substitutes appear far less than adequate. For example, it is not clear whether the substance of negotiated testing agreements are judicially reviewable, whereas section 2618 provides for review of final test rules in the Circuit Court of Appeals. Moreover, even if negotiated agreements were reviewable under the Administrative Procedure Act ("APA") as final agency action, the standard of "arbitrary and capricious" is a far less searching inquiry than section 2618(c)(1)(B)(i)'s "substantial evidence" standard. Similarly, should EPA be permitted to use voluntary testing programs in lieu of following the rulemaking process, the burden of notifying foreign governments of the availability of test data concerning chemicals they import would fall on the foreign nations themselves rather than the manufacturers and EPA as set forth in the statute. *Compare id.* § 2611(b) *with* CMA Memorandum at 37–38.

Finally, I note that most of the supposed benefits of negotiated testing agreements claimed by EPA and the intervenors can be preserved even if EPA complies with the statute's mandate. In support of these agreements, EPA has asserted that negotiated voluntary testing expeditiously provides the desired data in much the same way a test rule would—i.e. the negotiated agreement contains test standards, deadlines, interim review, and so forth. Therefore, as plaintiff suggests, it should be a straightforward task to incorporate existing voluntary programs into statutory test rules.

Plaintiffs have no objection in principle to EPA's negotiation of testing agreements with affected industries. Nor are [they] challenging here the substance or the scientific basis of the negotiated agreements. The gravamen of plaintiffs' complaint is that federal defendants' failure to incorporate these negotiated testing schemes into binding rules has subverted TSCA's statutory foundation.

Plaintiffs' Memorandum of Law at 23.

I agree that the negotiated programs without rulemaking cannot be sanctioned under TSCA, though negotiation to determine appropriate test protocols as well as other relevant criteria certainly is not only permissible but indeed preferable to blind, often impractical, bureaucratic blundering. Accordingly, partial summary judgment is granted in favor of plaintiffs on their first four claims. The parties are ordered to meet to attempt to stipulate to a reasonable timetable for the incorporation of the existing voluntary programs into statutory test rules. In the absence of agreement within thirty (30) days from the date hereof, the parties should submit their respective contentions to this court for a determination of any unresolved issues.

The other three categories of claims in plaintiffs' complaint all involve challenges to EPA action when it does in fact decide to conduct rulemaking. The first category involves use of an Advance Notice of Proposed Rulemaking ("ANPR") for proposing the testing of chemical groups. The second involves EPA's two-phase rulemaking procedures for the testing of individual chemicals. Plaintiffs' final claims involve defendants' failure to promulgate final rules after proposed rules have been published and commented upon.

## II. "Initiation of Rulemaking": ANPRs

Plaintiffs' argue that EPA's publication of an ANPR within the twelve-month period after ITC designation is insufficient to constitute "initiation of rulemaking proceedings." Testing rule proposals alone, according to NRDC, initiate such proceedings. I disagree, but I turn first to some background and preliminary questions.

A. Fluoroalkenes' Administrative History

On November 25, 1980, the ITC designated the chemical category fluoroalkenes for priority consideration for issuance of a test rule. 45 Fed.Reg. 78443 (Nov. 25, 1980). ITC cited the suspected adverse public health and environmental effects of fluoroalkenes including cancer, genetic damage, and reproductive effects. The only action taken in the subsequent twelve months was the issuance on October 30, 1981, of an ANPR which stated:

EPA has reviewed the ITC report, the available data on which the recommendation was based, the information obtained at, or subsequent to the scoping workshop, and information obtained from EPA's own information-gathering activities. The Agency in general accepts the recommendations of the ITC that members of the fluoroalkene category be considered for testing for carcinogenicity, mutagenicity, teratogenicity, reproductive effects and other toxic effects.

46 Fed.Reg. 53704. Nonetheless, EPA did not propose a rule because "[t]he Agency has found that in attempting to develop formal rulemaking for [this chemical] category, the issues which require attention are more complex and numerous than in rulemaking for a single chemical and thus require more time." Id. 53705.[7] Therefore, instead of a test rule proposal, EPA published an ANPR outlining some of EPA's tentative decisions and the issues it perceived needed to be addressed. See id. at 53706–07. The ANPR "(1) [i]nform[ed] the public of the rationale to be used in selecting the chemicals for testing; (2) define[d] the testing it [was] considering proposing; and (3) [sought] public comment on these plans to propose test rules." Id. 53704; see also id. 53706–07.

No further action was taken by EPA until after this motion was pending. On June 4, 1984, EPA announced that it was terminating the proceedings concerning fluoroalkenes, which it had begun with the October 1981 ANPR, and it was accepting a negotiated voluntary testing agreement (of the type discussed supra section I) for four of the six chemicals in the fluoroalkene category. 49 Fed.Reg. 23,112 (June 4, 1984).

B. Withdrawal of the Fluoroalkenes' ANPR and Mootness

 The original basis for plaintiffs' fifth claim was NRDC's assertion that an ANPR issued within twelve months of ITC designation did not constitute "initiation of rulemaking proceedings." Because EPA has withdrawn the fluoroalkenes' ANPR, it asserts that this claim is now moot. "Courts are understandably reluctant to permit agencies to avoid judicial review, whenever they choose, simply by withdrawing the challenged rule." Dow Chemical Co. v. EPA, 605 F.2d 673, 678 (3d Cir.1979).

Where a court is asked to adjudicate the legality of an agency order, it is not compelled to dismiss the case as moot whenever the order expires or is withdrawn. Consideration of important legal issues ought not to be, as they might be, defeated by short term orders, capable of repetition yet evading review.

Nader v. Volpe, 475 F.2d 916, 917 (D.C.Cir. 1973) (quoting Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). Moreover, when an administrative agency withdraws an order while still maintaining that the legal position is justified, repetition is likely and the claim should not be considered moot. See Doe v. Harris, 696 F.2d 109, 113 (D.C.Cir.1982) ("when a complaint identifies official conduct as wrongful and the legality of that conduct is vigorously asserted by the officers in ques-

7. EPA apparently utilizes ANPRs only for those ITC designations which are complex chemical categories. See, e.g., 47 Fed.Reg. 973 (Jan. 8, 1982) (ANPR for complex category of phenylenediamines); 48 Fed. Reg. 57452 (Dec. 29, 1983) (aryl phosphates); 48 Fed.Reg. 57562 (Dec. 30, 1983) (glycidol and its derivatives); 49 Fed.Reg. 108 (Jan. 3, 1984) (anilines); and 49 Fed.Reg. 449 (Jan. 4, 1984) (alkyl expoxides). EPA's Memorandum at 28 n. *.

tion, the complainant may justifiably project repetition"). Although not directly relevant to the mootness question, I also find that EPA's use of ANPRs to initiate rulemaking proceedings is a legitimate exercise of agency implementing discretion.

### C. Use of ANPRs Under TSCA

■ As previously cited, TSCA requires that within twelve months of ITC designation "the Administrator shall with respect to such chemical substance or mixture either initiate a rulemaking proceeding *under subsection (a)* of this section or ... publish [its] reason for not initiating such a proceeding." 15 U.S.C. § 2603(e)(1)(B). Plaintiffs contend that section (a) requires a proposed rule as defined by section 2603(b) in order to initiate rulemaking. This latter section provides:

A rule *under subsection (a)* of this section shall include—

(A) identification of the chemical substance or mixture for which testing is required under the rule,

(B) standards for the development of test data for such substance or mixture, and

(C) ... a specification of the [reasonable] period within which the persons required to conduct the testing shall submit to the Administrator data developed in accordance with the standards ....

(Emphasis added). Plaintiffs maintain that an ANPR is deficient in failing to include these specific characteristics of a proposed test rule.

Section 2603(b)(1), however, only defines *"[a] rule* under subsection (a)." The twelve-month requirement of section 2603(e)(1)(B), on the other hand, requires initiation of *"a rulemaking proceeding* under subsection (a)."* Thus, the logical interpretation of this language is that EPA need only start the rulemaking process within twelve months.

Furthermore, reference must be made to a definition of "initiation of *rulemaking"* rather than a definition of "a rule." Unfortunately, TSCA does not explicitly de-

fine the former phrase. When Congress does not appear to have directly addressed a specific statutory interpretation issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, Inc. v. NRDC,* —— U.S. ——, ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

Rulemaking is alluded to in section 2603(b)(5), which provides that "[r]ules issued under subsection (a) of this section ... shall be promulgated pursuant to section 553 of Title 5 ...." Under 5 U.S.C. § 553(b):

[a g]eneral notice of proposed rule making ... shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Thus, the minimum of a "proposed rule" under section 553(b) of the APA would appear to permit the ANPRs published by EPA. ANPRs include "a description of the subjects and issues involved." In addition, EPA's structuring of the rulemaking proceedings to resolve the difficult scientific issues presented is entitled to "great deference." *EPA v. National Crushed Stone Association,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). Unlike the prior instance involving negotiated testing agreements, EPA's interpretation of TSCA is a reasonable and permissible interpretation of the statute on a question to which Congress has not directly spoken. Here, the administrative agency must evaluate conflicting policies such as expeditious rulemaking versus developing precise and reliable test substances and protocols; the resolution of the conflict is a matter particularly within its discretion. *See Connecticut Fund For the Environment, Inc. v.*

*EPA,* 696 F.2d 169, 173–74 (2d Cir.1982).[8] Chemical categories as opposed to individual substances apparently may present several additional complexities necessitating a more open-ended public solicitation of information. For example, EPA may have to decide whether each chemical or representative chemicals need to be tested, whether one chemical's toxicological data may be used to assess another's health or environmental effects, whether the chemicals have common patterns of production, exposure, use, chemical properties, and so forth. *See generally* Clay Affidavit at ¶¶ 28–30 at 12–14. Thus, ANPRs serve the valuable function of potentially narrowing and focusing the scope of testing. Therefore, based on the absence of Congressional indicia to the contrary, as well as EPA's reasonable interpretation of the confluence of TSCA section 2603 with APA section 553, EPA's use of ANPRs appears to be a permissible construction of the Act.[9]

In essence, plaintiff's complaint is that use of ANPRs substantially delays the rulemaking process. The structuring and the timing of rulemaking proceedings, however, are two different aspects of the process. Thus, though EPA's use of an ANPR may be permissible, a subsequent period of three years inactivity may be unreasonably delayed agency action in vio-

lation of the APA—an issue I discuss below. In any case, EPA recently has terminated rulemaking proceedings and has accepted a negotiated voluntary testing program for fluoroalkenes. Because I have already found the negotiated programs invalid agency action, the four fluoroalkene chemicals should be added to plaintiffs' first four claims as part of the parties' discussions aimed at arriving at a reasonable rule-incorporation timetable. The other two fluoroalkene chemicals apparently involve mooted claims.

### III. Two-Phase Rulemaking Process

#### A. Description of the Two-Phase Process

Plaintiffs' third category of claims (Complaint Claims Six through Eleven) challenge EPA's use of two-phase rulemaking proceedings for individual chemicals.

The two-phase procedure was developed in 1982 in response to certain manufacturer's criticism that EPA's initial decision to establish generic test methodology requirements applicable to all testing (with appropriate modifications). *See* 47 Fed.Reg. 13012–13 (March 26, 1982).[10] These critics "insisted that more flexibility in the selection of testing methods and in development of testing protocols was needed because

**8.** *See also Chevron, Inc. v. NRDC:*

> We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations
>
> "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."

—— U.S. at ——, 104 S.Ct. at 2782 (citations and footnote omitted).

**9.** Certainly, unlike under TSCA, Congress has previously expressly provided that the EPA publish complete proposed regulations. *See, e.g.,* 42 U.S.C. §§ 7571(a)(2), 7457(b) (the Administrator shall "propose regulations" under the Clean Air Act); 42 U.S.C. § 4916 (the Administrator shall publish "proposed" noise emission regulations

for railway surface carriers); 42 U.S.C. § 300g–1 (the Administrator shall publish "proposed" national interim drinking water regulations). TSCA itself is replete with express references to proposed rules, but not in the provision requiring agency action within twelve months.

**10.** As explained by the EPA Office Director for the Office of Toxic Substances:

> EPA planned to codify these test standards in the Code of Federal Regulations after responding to public comment and providing supporting documentation. Thereafter, the pertinent test standards, subject to appropriate modifications, were to be incorporated by citation into specific chemical substance test rules. 47 Fed.Reg. 13012–13 (March 26, 1982). Thus, for example, each time an oncogenicity study was to be performed pursuant to a chemical-specific TSCA section 4 test rule, the test would have to be conducted in accordance with the requirements of the generic oncogenicity test standard.

Clay Affidavit ¶ 32 at 15.

modifications of test requirements would routinely be necessary due to the dynamic nature of chemical testing." *Id.* 13013; *see also* Clay Affidavit ¶¶ 31–37 at 14–17 (describing EPA decision to abandon generic standards for two-phase rulemaking). Therefore, EPA adopted the two-phase procedure:

> The Agency believes issuance of generic test methodology guidelines rather than generic test requirements will provide more flexibility for test facilities, test sponsors and the Agency itself to arrive at cost-effective, mutually agreeable test methodologies, and allow for the incorporation of scientific judgment where necessary. There will now be the capability to require testing for effects of concern for which there are currently no available guidelines and allow test sponsors to use protocols which are in use in the scientific community. Sponsors would also be free to develop innovative testing methodologies. The provision for protocol approval allows EPA the capability to remedy deficiencies in sponsors' protocols to assure that data generated under test rules will be adequate and reliable.

*Id.* 13012, 13013.

In the first phase, EPA publishes a notice identifying the chemical to be tested, reviews existing data, and describes the health and/or environmental effects for which testing must be conducted. Formulation of test standards and deadlines is left for the second phase of rulemaking. Before reaching the second phase, EPA publishes the phase one "test rules" after which the affected firms are required to develop the specific test protocols—apparently within ninety days. *See* CMA's Memorandum at 58–59. These phase one "rules" are published for comment, and then ostensibly EPA issues phase two rules and final complete test rules.[11]

**B. Claims Six through Eleven**

Claims Six through Eleven involve chemicals designated by ITC as long as nearly seven years ago.[12] To date, only phase one "test rules" have been proposed.[13] EPA has never issued a proposed phase two test rule and in fact has indicated that it may withdraw all, if not most of the five phase one test rules proposed thus far. *See supra* note 11. Plaintiffs argue that TSCA requires publication within twelve months of a complete test rule proposal as defined by section 2603(b)(1), including test standards and deadlines. In response, defendants first assert several threshold jurisdictional defenses which merit little discussion.

**C. Jurisdictional Defenses**

**(1) Final Agency Action**

■ First, EPA contends that there has been no final agency action and thus there can be no judicial review; EPA has only proposed partial rules for comment. Plaintiffs, however, do not seek review of the rules' parameters which are only at the "partially proposed" stage. Rather, plaintiffs challenge the defendants' two-phase procedures in formulating these parameters. There certainly has been final agency action with respect to EPA's decision to use two-phase rulemaking. *See, e.g.,* 47 Fed.Reg. 13012 (March 26, 1982).

**(2) Ripeness**

■ EPA asserts that these claims are not ripe for judicial review because the proposed test rules are not final. Further proceedings may "mature the issues for

---

11. EPA has never issued a proposed phase two "test rule," and has indicated it may withdraw all if not most of the five phase one rules here in issue. *See* NRDC Letter Dated July 9, 1984 at 6 n. 5.

12. The Claims Six through Eleven chemical substances, and their ITC designation dates and recommended testing are attached as Appendix 2.

13. Phase one "test rules" were proposed for each chemical on the following dates: Biphenyl, 48 Fed.Reg. 23080 (May 23, 1983); Cresols, 48 Fed.Reg. 31812 (July 11, 1983); Diethylenetriamine, 47 Fed.Reg. 18386 (April 29, 1982); Ethyltoluene, 48 Fed.Reg. 23088 (May 23, 1983); Mesityl Oxide, 48 Fed.Reg. 30699 (July 5, 1983), and Trimethlbenzene, 48 Fed.Reg. 23088 (May 23, 1983).

judicial review." EPA's Memorandum at 39. Again, defendant misreads plaintiffs' claims. It is not the proposed rules themselves that plaintiffs challenge. Rather, it is EPA's choice of methodology and timing in formulating proposed rules which are at issue. Furthermore, EPA's justiciability and other arguments concerning administrative burden are patently meritless. *See, e.g., Oneida Indian Nation v. County of Oneida,* 719 F.2d 525, 538–39 (2d Cir.1983), *cert. granted,* — U.S. —, 104 S.Ct. 1590, 80 L.Ed.2d 123 (1984).

### (3) Circuit Court Jurisdiction

■ EPA's last jurisdictional defense is that the Court of Appeals has exclusive jurisdiction of test rule review. Section 2618(a)(1)(A) provides that the "Courts of Appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review ... of such a rule ...." 15 U.S.C. § 2618(a)(1)(A). Plaintiffs, however, do not seek judicial review of finally-promulgated test rules, as in *Dow Chemical Co. v. Costle,* 484 F.Supp. 101 (D.Del. 1980). Plaintiffs instead are challenging EPA's alleged failure to initiate rulemaking by proposing test rules as defined in section 2603(b)(1). This must be reviewed in the district court.

### D. TSCA and Two-Phase Rulemaking

Plaintiffs assert, similar to their challenge of ANPRs, that phase one "test rules" do not satisfy the statutory requirement of initiating rulemaking proceedings within twelve months. As I made clear during my discussion of ANPRs, the statute nowhere defines "initiation of rulemaking proceedings," and the implementing

agency's reasonable and permissible interpretation of the clause is entitled to "great deference." *See Chevron v. NRDC,* — U.S. at —, 104 S.Ct. at 2782.

■ Plaintiffs, in fact, do not actually "quarrel with the concept of a two-step process for developing chemical testing rules. But [they] do take issue with the use of such a process when its effect is to extend indefinitely the Congressionally established one-year deadline for initiating rulemaking action." Plaintiffs' Memorandum at 55. As I have held above, however, EPA need not complete rulemaking within one year, and the structuring of its initiation and consummation of rulemaking is constrained primarily by only the broad contours of the APA.[14] Accordingly, plaintiffs' motion for summary judgment on Claims Six through Eleven must be denied. Defendant's motion to dismiss these claims, however, must also be denied because there are unresolved material issues of fact.

■ The essence of plaintiffs' claims here are that EPA's interminable delay in promulgating testing rules violates TSCA. They may well be right. Although I find the two-phase process permissible, the failure to promulgate final testing rules for up to seven years may constitute agency action unreasonably delayed. This is a matter I turn to more fully in addressing plaintiffs' final claims. With respect to the instant claims, however, plaintiffs bear the burden of establishing on summary judgment the absence of unresolved material issues of fact. 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.-15[3] at 56–463 (2d ed. 1983). In their

---

**14.** EPA recently has admitted that it perceives deficiencies in the two-phase process. *See* 48 Fed.Reg. 31812, 31815 (July 11, 1983):

> EPA has been reevaluating this two-phase rulemaking process with a view to improving its efficiency. The Agency is considering a modification as follows. EPA would conduct its rulemaking in a single phase. The proposed test rule would contain all the necessary elements: The basis for the testing decision, who must test, the tests to be performed, and the test standards which would apply to the specific tests.

. . . . .

> EPA believes such a change would be appropriate in light of its experience in rulemaking under section 4 and would be likely to speed the process for adopting test rules.

This does not prohibit EPA from continuing to use the two-phase system, though it may be relevant on the question of unreasonable delay. *See infra* section IV(B). This is exactly the type of administrative evaluation that has been committed to the Agency's reasonable discretion.

motion papers, plaintiffs did not directly assert this proposition, and accordingly EPA has not attempted to justify or explain the delay. Therefore, on the present record, I cannot determine whether there was excessive delay, and both parties' motions concerning Claims Six through Eleven must be denied.

## IV. Unreasonably Delayed Agency Action

Plaintiffs' final category of claims—twelve through sixteen—involve chemicals for which there have been complete test rules proposed, but no final rules promulgated. . All five were designated by ITC over six years ago, with proposed rules published three to four years ago suggesting testing of these chemicals for cancer, gene mutations, and birth defects effects.[15] Plaintiffs maintain that the lengthy delay constitutes agency action "unlawfully withheld and unreasonably delayed."

EPA responds with three arguments: (1) it intends to withdraw "most" of the proposed rules rendering these claims moot; (2) EPA has no mandatory duty to promulgate final test rules "within any particular time frame," and (3) EPA in any case has not unreasonably delayed final rule promulgation.

### A. Mootness

■■■ EPA to date has withdrawn only two of the five proposed rules involved here. On June 19, 1984, EPA published notice that the proposed test rule for dichloromethane (Claim Fifteen) would be withdrawn. EPA had concluded that data received subsequent to the proposal, as well as a reevaluation of previously available data, indicated that the agency had "a sufficient basis to reasonably determine or predict that the current manufacture, processing, distribution in commerce, use, or disposal of this substance does not present an unreasonable risk of adverse effects to the environment." 49 Fed.Reg. 25009, 25009. Therefore, this claim has been mooted and it is dismissed.

EPA also withdrew the nitrobenzene (Claim Fourteen) proposed rule on June 19, 1984. 49 Fed.Reg. 25013. Its reasons for the nitrobenzene proposed rule withdrawal were somewhat different:

This withdrawal results from the Agency's evalution [sic] of additional Agency and industry data and also from EPA's knowledge that the manufacturers of nitrobenzene are conducting health and environmental tests that, in conjunction with ongoing government testing programs, are expected to meet all testing data needs currently identified by the Agency. The ongoing tests, along with existing information, are expected to provide sufficient data and experience to reasonably determine or predict the effects that manufacture, processing, distribution, use and disposal of nitrobenzene will have on human health, or in the case of mutagenic effects, to provide a clear basis for determining if there is any need for further testing.

Because there are other challenged chemical substances remaining in this category, plaintiffs' arguments against mootness are not applicable. Furthermore, there is no allegation that the "ongoing" manufacturers' testing is *sub silentio* a negotiated program of the type discussed above in section I. This testing apparently had been initiated before the ITC designation. *See* 49 Fed.Reg. at 25014, 25016. Therefore, Claim Fifteen is dismissed.

EPA has proposed also to withdraw the proposed test rule for chlorinated benzenes. *See* 48 Fed.Reg. 54836 (Dec. 7, 1983). Until it does so, however, the claim is not as yet moot. Further, there is no bar to judicial review because there has been "no final agency action." It is agency "inaction" that is the very basis of plaintiffs' Claim Thirteen.

### B. EPA's Duty To Promulgate Final Test Rules

■■■ EPA asserts that it "has no mandatory duty to promulgate a final test rule

---

**15.** The chemical substances in Claims Twelve through Sixteen were designated by ITC for recommended testing as set forth in Appendix 3.

EPA proposed testing rules on the dates set forth in Appendix 4.

within any particular period of time after issuance of a proposed rule." Defendants' Memorandum at 45. A citizen suit under TSCA may involve review only of mandatory EPA duties. *See* 15 U.S.C. § 2619(a)(2). Thus, EPA argues, this court is without subject matter jurisdiction over the remaining claims. I disagree.

TSCA does not explicitly delineate final rule promulgation deadlines. Numerous other time provisions are expressly stated in the statute. *See, e.g.,* 15 U.S.C. § 2603(e)(1)(B) (first ITC designations required within nine months of TSCA effective date; twelve month "initiation of rulemaking" timeframe); 15 U.S.C. § 2605(e)(1) (EPA required to promulgate final regulations concerning the disposal of and warning labels for polychlorinated biphenyls within six months of TSCA's effective date). Congress, thus, appears to have left EPA with at least some discretion to timing the promulgation of final rules. Certainly, there is reason for leaving EPA some discretion. ITC-designated chemical groupings, for example, may require more proceedings and time before a final rule can be promulgated than an individual chemical substance. *See supra* section II(C). Nonetheless, I find that the statute imposes the timing limitation of reasonableness on EPA's actions.

Promulgation of test rules is a mandatory EPA duty. *See* 15 U.S.C. § 2603(a); *supra* section I(B). Rulemaking proceedings initiated pursuant to section 2603 must be conducted in accordance with the APA notice and comment provisions of 5 U.S.C. § 553. Under related APA § 706(1), the "reviewing court shall—(1) compel agency action unlawfully withheld or unreasonably delayed ...." *See also Environment Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283–84 (D.C.Cir.1981) ("Judicial review of agency *inaction,* on the other hand, is governed by ... 5 U.S.C. § 706(1) ... [involving] whether the agency's delay in acting has been unreasonable") (citations omitted) (emphasis in original).

The fact that EPA published proposed test rules demonstrates that EPA, as well as the ITC panel of experts, believed that without more information these chemicals presented unreasonable risks of cancer, birth defects, and mutation. EPA's assertion that even unreasonably lengthy subsequent time delays are countenanced by TSCA would permit EPA—whatever the likelihood—to never promulgate a final test rule if it so decided. Given Congress' pronounced concern with the profound risks associated with the increased marketing of chemicals with untested toxicities, it could not have intended to vest EPA with such unbounded discretion. Accordingly, I hold that EPA's conduct concerning plaintiffs' Claims Twelve, Thirteen, and Sixteen is subject to review under a standard of reasonableness.

## C. The Reasonableness of EPA's Delay

First, I reject EPA's assertion that to establish unreasonable delay plaintiffs must prove bad faith on EPA's part. I do not find that *National Congress of Hispanic American Citizens v. Marshall,* 626 F.2d 882 (D.C.Cir.1979), mandates such a requirement in this case. "Reasonableness" alone is the sole requirement. *See Environmental Defense Fund v. Costle,* 657 F.2d at 283–84. "Judicial review of decisions not to regulate must not be frustrated by *blind* acceptance of an agency's claim that a decision is still under study." *Sierra Club v. Gorsuch,* 715 F.2d 653, 659 (D.C.Cir.1983) (emphasis in original). Such a requirement would be a virtually insurmountable barrier to adequate review of bureaucratic conduct. EPA's proffered good faith would seem to be only one fact relevant to the issue whether the delay was reasonable.

On the other hand, "[a]bsent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of a rulemaking proceeding is entitled to considerable deference." 715 F.2d at 658. The numerous factors which do counsel expeditious rulemaking, including Congress' evident belief that prompt action was important, *see, e.g.,* 15 U.S.C. §§ 2603(e)(1), (2), also go to the issue of the reasonableness of EPA's delay. Furthermore, "[d]elays that might be alto-

gether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake. This is particularly true when the very purpose of the governing Act is to protect those lives." *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157–58 (D.C.Cir.1983) (citations and footnote omitted). With these principles in mind, I turn to EPA's explanation for the lengthy delays in this case.

EPA states that it intends to withdraw virtually all of the proposed test rules, and thus it has not formulated final rules. Industry has submitted substantial data from ongoing testing programs which EPA believes will accurately predict the toxicity effects identified in the proposed test rules. Due to "limited resources" and "higher priorities" EPA has decided to sit back and wait for the data to come in. Although funding and personnel inadequacies do not excuse failure to fulfill a statutory duty, *see Sun Enterprises, Ltd. v. Train*, 532 F.2d 280, 290 (2d Cir.1976) ("while we appreciate the difficulties involved in reviewing the large number of applications forwarded by EPA to Interior, we cannot condone what amounts to administrative or executive repeal of an Act of Congress"), here they are relevant to the reasonableness of EPA's conduct.

■ The chemicals in Claims Twelve and Thirteen were recommended for testing by ITC nearly seven years ago on October 12, 1977, while the Claim Sixteen chemical was recommended virtually as long ago on April 19, 1978. *See* Appendix 3. They were among the first chemicals so designated by ITC. No rulemaking activity concerning these chemicals, however, took place until after NRDC brought a successful action to compel EPA's compliance with TSCA in 1979. *See NRDC v. Costle*, 10 Envtl.L.Rep. (Envtl.L.Inst.) 20274 (S.D.N.Y. Feb. 4, 1980). Thereafter, pursuant to a stipulated timetable, EPA proposed rules for the Claims Twelve and Thirteen chemicals on July 18, 1980, and for the remaining chemical on June 5, 1981. Since then, there have been three and four years without any formal rulemaking accomplished. In effect, EPA has accepted *de facto* voluntary testing programs in place

of rulemaking. Voluntary testing programs, I already have held, are inadequate to fulfill the statutory mandate. If testing is proposed or occurring at present in an acceptable format, it should not be difficult for EPA to incorporate such programs into formal rules. This is not meant to exalt form over substance. As I noted previously, formal test rules trigger several statutory provisions not otherwise effectuated. Furthermore, rulemaking with public scrutiny and commentary concerning test substances, standards, and deadlines lies at the heart of TSCA. EPA's decision to withhold final promulgation of test rules thus subverts the essence of the statutory scheme. Accordingly, I find that defendants have unreasonably delayed agency action on the chemicals in plaintiffs' Claims Twelve, Thirteen, and Sixteen. All parties are once again directed to confer to attempt to stipulate to a timetable for the proper termination of rulemaking proceedings with respect to these three chemical substances and either file the stipulation with the Court or their respective positions on the question within thirty (30) days hereof.

### CONCLUSION

In sum, defendants' motion to dismiss or in the alternative for summary judgment is denied except plaintiffs' Claims Fourteen and Fifteen are dismissed. Plaintiffs' motion for partial summary judgment on the issue of liability is granted with respect to Claims One through Five, Twelve, Thirteen, and Sixteen. Its motion for partial summary judgment on Claims Six through Eleven is denied. The parties are directed to comply with the instructions of this opinion so that a final judgment may be entered as expeditiously as possible.

SO ORDERED.

### APPENDIX 1

| Chemical | ITC Designation for Priority Testing | Testing Recommended for |
|---|---|---|
| Benzyl butyl phthalate | Nov. 25, 1980 45 Fed. Reg. 78441 | cancer, reproductive effects, environmental effects |
| 2-Chlorotoluene | May 22, 1981 46 Fed. Reg. 28140 | cancer, genetic damage, chronic effects, reproductive effects, birth defects, environmental effects |

| Chemical | ITC Designation for Priority Testing | Testing Recommended for |
|----------|--------------------------------------|-------------------------|
| 4-Chlorobenzotrifluoride | Feb. 5, 1982 47 Fed. Reg. 5460 | chronic effects, environmental effects |
| Formamide | May 25, 1982 47 Fed. Reg. 22592 | cancer, genotoxic effects, other chronic effects |

## APPENDIX 2

| Chemical | ITC Designation for Priority Testing | Testing Recommended for |
|----------|--------------------------------------|-------------------------|
| Biphenyl | May 25, 1982 47 Fed. Reg. 22588 | environmental effects, chemical fate |
| Cresols | Oct. 12, 1977 42 Fed. Reg. 55056 | cancer, genetic damage, birth defects, other chronic effects, environmental effects |
| Diethylenetriamine | May 22, 1981 46 Fed. Reg. 28142 | chronic effects, reproductive effects, birth defects |
| Ethyltoluene | May 25, 1982 47 Fed. Reg. 22590 | genetic damage, subchronic toxicity, environmental effects, chemical fate |
| Mesityl Oxide | June 1, 1979 44 Fed. Reg. 31884 | cancer, genetic damage, birth defects, other chronic effects and epidemiology |
| Trimethylbenzene | May 25, 1982 47 Fed. Reg. 22593 | subchronic/chronic effects, birth defects, reproductive effects, environmental effects, chemical fate |

## APPENDIX 3

| Chemical | ITC Designation for Priority Testing | Testing Recommended for |
|----------|--------------------------------------|-------------------------|
| Chloromethane | Oct. 12, 1977 42 Fed. Reg. 55055 | cancer, genetic damage, birth defects, other chronic effects |
| Chlorinated benzenes | Oct. 12, 1977 42 Fed. Reg. 55053 | cancer, genetic damage, birth defects, other chronic effects, environmental effects |
| Nitrobenzene | Oct. 12, 1977 42 Fed. Reg. 55058 | cancer, genetic damage, environmental effects |
| Dichloromethane | April 19, 1978 43 Fed. Reg. 16684 | cancer, genetic damage, birth defects, other chronic effects, environmental effects |
| 1,1,1-Trichloroethane | April 19, 1978 43 Fed. Reg. 16684 | cancer, genetic damage, birth defects, other chronic effects |

## APPENDIX 4

| Chemical | EPA Proposed Testing Rule |
|----------|---------------------------|
| Chloromethane | July 18, 1980 45 Fed. Reg. 48536 |
| Chlorinated benzenes | July 18, 1980 45 Fed. Reg. 48541 |
| Nitrobenzene | June 5, 1981 46 Fed. Reg. 30308 |
| Dichloromethane | June 5, 1981 46 Fed. Reg. 30305 |
| 1,1,1-Trichloroethane | June 5, 1981 46 Fed. Reg. 30310 |